**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL KEY (K54135),** | ) | |
| **Petitioner,** | ) | **Case No. 10-CV-638** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **SHERWIN MILES,[1]** | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

In the early morning hours of July 27, 1999, police responded to reports of a shooting at a residence in Chicago, Illinois, belonging to Barreto Williams ("Williams"). Upon arrival at the residence, police discovered a grisly scene: Williams lay dead with a single gunshot wound to the head, while Adrian Perez ("Perez"), who had suffered several gunshot wounds to his face, was still alive. Perez survived his injuries and identified petitioner Michael Key ("Key") as the shooter. Following a jury trial in the Circuit Court of Cook County, a jury found Key guilty of first degree murder, attempted first degree murder, and armed robbery. The trial court then sentenced Key to serve out his natural life in prison. Before this court is Key's second amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, ECF No. 68, filed with the assistance of appointed counsel. For the following reasons, the petition is denied.

## I. BACKGROUND

The following facts and procedural history are drawn from the state court record. ECF Nos. 21, 41.

---

[1] The Illinois Department of Corrections inmate locator states that Key is presently incarcerated at the Stateville Correctional Center. The current warden is Sherwin Miles ("Miles"). Accordingly, Miles is substituted as the respondent. *See* Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts; *Rumsfeld v. Padilla*, 542 U.S. 426, 436 (2004).

A. **The Night of the Shooting**

The evidence adduced at trial established the following. In the early morning hours of July 27, 1999, Barreto Williams and Adrian Perez arrived at Williams's apartment. *People v. Key*, Direct Appeal Opinion (June 10, 2005), ECF No. 21-2, Ex. B. at 2. A short time later, Williams's boyfriend, Spanish Brown (known as "Spade"), and Key (a friend of Spade) came to the apartment. *Id.* A third individual, William Jones, arrived sometime later. *Id.*

Once inside Williams's apartment, Key pulled out a gun, held it to Williams's head, and told Williams to open her bedroom safe. *Id.* Williams claimed not to know the combination, at which point Key ordered everyone into the bedroom and threatened that someone would be killed if Williams did not open the safe. *Id.* Key then took jewelry from Williams and Perez and ordered Spade to tie them up. *Id.* Spade tied Perez's hands behind her back using a phone cord and placed a sock in her mouth. Spade also tied up and gagged Williams. *Id.* Key repeatedly hit Williams in the face and continued to yell at her in an effort to get her to open the safe. *Id.* Key and Spade then began to search the apartment and gather electronics. *Id.* As these events were unfolding, Williams's roommate Octavian ("Tae") Terry arrived outside and called up to Williams, asking her to drop her keys down to him. *Id.* Perez heard Key, Spade, and Jones drop the keys down to the street. *Id.* Perez managed to free herself from her bonds; she shouted to Tae to stay outside and call the police. *Id.* at 3. Williams, who was still bound and gagged, managed to get to the window and hang out of it. *Id.* Key ran into the bedroom, pulled Williams away from the window, and fatally shot her in the head. *Id.* Spade and Jones ran out of the apartment. Key then shot Perez three times: in the head, the face, and the arm. *Id.* Tae, hearing the shots from outside the residence, ran and called the police. *Id.* Perez was transported to the hospital, where she received extensive medical treatment. *See id.*

2

### B.  **Lineups, Guilty Plea, and Withdrawal of Guilty Plea**

In August 1999, police asked Perez to view a series of photographs.  Trial Tr. (Adrian Perez),[2] ECF No. 21-4 at 305, Ex. R at CCC-77:8–13.  She identified Key, Spade, Jones who came to Williams's apartment, and Key as the shooter.  (*Id.* at CCC-77:17 to CCC-78:22, CCC-95:9 to CCC-97:12).  In 2000, Perez identified Key in a lineup, even though Key had since shaved his braids off.  *Id.* at CCC-79:11 to CCC-81:10.  Key was apprehended a few months later in Indiana.  ECF No. 41-7, Ex. 7 at 206:7–9.  He was initially represented by a public defender and pled guilty to first degree murder, armed robbery, and home invasion charges on the day his trial was scheduled to commence.  He later withdrew his guilty plea and retained Anderson J. Ward ("Ward") to represent him at trial.[3]

### C.  **Pretrial Proceedings: Key's Motion to Suppress**

#### 1.  *The Statement*

Before trial, Key filed a motion to suppress a written document titled "Statement of Facts" ("the Statement").  In the Statement, Key detailed the events that took place during his time at Williams's apartment on the night of the shootings.  Because the Statement is at the heart of Key's § 2254 petition, the court reproduces it verbatim and in full:

<blockquote>

"Statement of Facts"

On June 1999 at about 5:30 am me, Michael Key, Spanish Brown, and unknown ind. were at 71st between Constance and Ridgland going near victims house.  When we rung the bell the keys were dropped down to us out of the 3rd floor window.  We entered the building, went up stairs and entered the apartment.  At that time the deceased victim became hostile saying he didn't know I was with Span, and that I

</blockquote>

---

[2] Parentheticals next to citations to transcripts identify the witness who was testifying.

[3] Anderson J. Ward was suspended from practicing law until further order by the Illinois Supreme Court on September 20, 2011, based on actions unrelated to his representation of Key.  *In Re Anderson J. Ward*, 09 PR 0037 (Ill. Sept. 20, 2011).  *See SEC v. Milan Grp., Inc.*, 124 F. Supp. 3d 21, 26 (D.D.C. 2015) (taking judicial notice of a disbarment order).

had to go.[4]  She then became more hostile and started calling me out of my name. So me being who I am and always carrying my gun I wasn't about to let no fag ass nigga talk to me that way.  So I pulled my gun out and smacked his ass with it.  He then began to holler so I told him to shut the fuck up, and who the fuck did he think he was talking to.  His friend the other victim began screaming so I smacked him to, and told him if he keeps it up I was going to shoot his ass.  I then took the deceased in the room and began pistol whipping him, Span came in and ask what to do. I told him to tie there ass up and we were leaving.  After they were tied up ~~one of them~~ we began searching the house for whatever they had.  We already knew they had some money, and jewelry so we decided to take it.  ~~Somehow though the dee~~ As we were looking through the house somebody rang the bell it was the other guy who lived there.  At that time the deceased jumped up by the window and hollard for help.  I then ~~shot~~ snatched him out the window and shot him in the top of his head.  The other victim began to scream so I shot him twice in his head, because I figured I had nothing else to loose, and we ran out of there.

ECF No. 68-1, Ex. A (handwritten, unsigned version of the Statement in full); *see also* ECF No. 72 at 5 (typed version of a portion of the Statement).

Key's pretrial motion to suppress (as well as Key's § 2254 petition) turned on the circumstances surrounding the drafting of the Statement and its discovery.  In the early morning hours of August 27, 2001, Eduardo Howar, an officer with the Cook County Sheriff's Department who was a member of the Special Operation Response Team and was trained in gang intelligence, conducted a surprise search of Key's cell.  Trial Tr. (Eduardo Howar), ECF No. 41-2 at KK-79 to KK-80, KK-86:2–20.  The purpose of the search was to locate contraband, such as gang communications.  *Id.* at KK-87:3-8.   Howar found several pieces of paper folded into small squares in a box containing Key's personal items.  *Id. a*t KK-89:13–21, KK-90:21–23. Howar believed these papers to be "gang kites."  *Id.* at KK-91:10–12.  A gang kite is "a letter that gang members write and . . . transport . . . throughout the [jail] . . . it's like mail between the gangs."  *Id.* at KK-83:8–10.  To prepare kites, gang members fold pieces of paper bearing

---

[4] The court here reproduces the inconsistent pronouns Key uses in reference to Williams.

4

messages into small squares or a triangle shape to make them easier to pass among inmates without being detected. *Id.* at KK-84:7–14.

According to Howar, the Statement was folded into a small square, similar to a gang kite. *Id.* at KK-91:9–12. The Statement was loose among other gang kites. Howar denied seeing or opening an envelope addressed to Ward. *Id.* at KK-92:17–19. Based on the contents of the box, Howar concluded that Key was a current member of the Gangster Disciples, *id.* at KK-99:11–18, although Key later testified that he had withdrawn from the gang in 1997. *Id.* at KK-71:10–12. Howar also testified that the rules of the Gangster Disciples gang ban homosexual behavior. *Id.* at KK-99:3–6. Based on this testimony, the state later argued that Key wrote the Statement to explain his conduct to other gang members because both Perez and Williams are transsexuals. Howar also testified that one of the gang kites recovered from Key's cell indicated that the gang was creating "a new legal staff and a new committee which will investigate all circumstances, and that [the newly formed] committee was going to have to send out memos." *Id.* at KK-98:22 to KK-99:2.

Initially, Howar "thought [the Statement] was a gang kite" because of the way it was folded. *Id.* at KK-91:12. When Howar read the Statement, he concluded that even though it was folded like a gang kite, it did not "appear to be a normal kite type" because it was not written in code and did not contain a date, "to" field, "from" field, a "greeting type of salutation," or "a salutation of some type at the end." *Id.* at KK-107:22 to KK-108:20, KK-110:18. Howar explained that he seized the document because he thought it was "basically a confession to a crime," as opposed to a gang kite. *Id.* at KK-110:23–24. Howar gave the Statement to the state prosecutor's office.

2. *Creation of the Statement*

5

At the suppression hearing, Key did not dispute that he wrote the Statement. *See* Suppression Hr'g Tr. (Michael Key), ECF No. 41-2 at KK-39:18. However, he argued that Ward instructed him to prepare the Statement and that it was therefore protected by the attorney-client privilege and work product doctrine. Ward had taken over Key's case from the public defender's office sometime in mid-2001. Suppression Hr'g Tr. (Anderson Ward), ECF No. 41-2 at KK-10:15–23. Ward testified that after meeting with Key and reviewing discovery produced by the state, he did not understand the chain of events on the night of the shooting. *Id.* at KK-12:1–4. He thus asked Key to "tell [him] what happened, to put that down in writing," but did not specify that Key should do so via a letter. *Id.* at KK-31:24 to KK-32:1. Ward expected that Key would give him the written summary on Key's next court date. *Id.* at KK-32:18–21.

Ward knew that Key was in custody at the Cook County Jail. *Id.* at KK-21:17–21. Ward did not advise Key regarding the risks associated with preparing a potentially incriminating document, especially given that Key was in custody. Ward also did not tell Key how to ensure that any written document would remain confidential. In contrast with the rough language of the Statement, Ward testified that Key was always courteous and respectful to Ward and always well-spoken and able to "communicate well." *Id.* at KK-26:19 to KK-27:4. Ward testified that Key had never bragged about being in jail or carrying a gun. *Id.* at KK-27:2–3, KK-31:14–15. Further, Ward described the Statement as "appear[ing] to be a folded up piece of paper" with stains and watermarks. *Id.* at KK-30:21 to KK-31:2.

Key testified that he wrote the Statement a few days after Ward asked him to do so. *Id.* at KK-40:17–21. He did not write a salutation or include a date or signature. *Id.* at KK-76:7–10. He never intended to mail the Statement to Ward as he did not know Ward's address. *Id.* at KK-48:23–24. He wrote "Statement of Facts" at the top of the document because Ward had

requested a "statement of facts." *Id.* at KK-76:11–13. Key testified that after he wrote the Statement, he folded it in half "the long way, probably twice," placed it in a sealed envelope, and wrote "legal mail" and "Anderson Ward," on the envelope's exterior. *Id.* at KK-40:22 to KK-41:13, KK-42:9–11, KK-77:10–11. Key last saw the Statement in his cell on the night of August 26, 2001. *Id.* at KK-42:5–16. When he saw it during the suppression hearing, it was in the same condition as it was when he wrote it, although it now had "purplish marks" that looked like scratches. *Id.* at KK-40:3. He later denied that the multiple folds that would result in a small square shape were on the Statement when he last saw it. *Id.* at KK-77:6–11.

### 3. *Discovery of the Statement*

According to Key, after the search ended and he returned to his cell, he found the envelope that had contained the Statement—now "wrinkled," "crumpled up," "like it was discarded, and "it's been opened"—on the floor. *Id.* at KK-43:7–10; KK-44:3–7. He tried to contact Ward several times by phone over the next few days. *Id.* at KK-69:12–24. Inmates regularly use toll calls from the jail, but Key was unable to reach Ward. *Id.* at KK-45:14–17. Ward first learned of the Statement of Facts and the search of Key's cell approximately one month later, on September 21, 2001, when the prosecutor gave a copy of the Statement to him in connection with the state's motion to obtain a handwriting sample from Key. *Id.* at KK-45:20–23. During the hearing on that motion, the state informed Ward about the Statement and the circumstances under which it was seized. *Id.* at KK-4:19 to KK-5:17. In its closing argument at the suppression hearing, the state argued, among other things, that Key could have forged the envelope at any time after Howar confiscated the Statement. *Id.* at KK-121:3–13.

### 4. *The Ruling on the Motion to Suppress*

The state trial court denied Key's motion to suppress in a written order. Ruling on Def.'s Mot. to Suppress (*People v. Key*, No. 00 CR 04985 (Cook Cty. Cir. Ct. June 19, 2002)), ECF No. 50-1 at 6. The court concluded that there was no Fourth Amendment violation, because an inmate has no legitimate expectation of privacy in a jail cell. *Id*. at 3–5.

Additionally, the court ruled that the Statement was not protected by attorney-client privilege. *Id*. at 5–6. The court found Howar to be credible and convincing in his denial that he opened any envelopes or removed any correspondence from envelopes, and in his testimony that the Statement was found loose among other gang kites. *Id*. at 5. The court further found that the Statement was not sealed in an envelope, not addressed to a particular individual, "much less [to] defendant's counsel," and rejected the proposition that the Statement had been made in confidence. *Id*. at 6.

### D. Key's Trial

In addition to the Statement of Facts, the state introduced the following evidence at Key's trial. First, the state called "Tae" Terry, Williams's roommate. Trial Tr. (Octavian Terry), ECF No. 41-5 at BBB-183. Terry testified that he arrived at Williams' apartment during the robbery. *Id.* at BBB-191:7–16. He testified that as he approached the apartment, he saw Williams standing at the window with her hands tied behind her back. *Id.* at BBB-194:16–22. At that point, Terry ran and heard gunshots as he ran. *Id*. at BBB-195:9–10. Terry, however, did not see Key at the apartment. *Id.* at BBB-201:1–3; BBB-205:1–4.

The state also called Perez, one of the victims. Trial Tr., ECF No. 41-6 at CCC-25. Perez testified that Key and Brown tried to access Williams's metal safe in the apartment. Trial Tr. (Adrian Perez), ECF No. 21-4 at 305, Ex. R at CCC-43:15 to 44:7. Perez also identified Key as the shooter and the weapon he used as a revolver. Trial Tr. (Adrian Perez), ECF No. 21-4, Ex.

R at CCC-69:15 to CCC-70:21; CCC-96:12 to CCC-97:12. Moreover, Perez testified about her prior identifications of Key from a photo array while she was in the hospital, and at a later lineup. Trial Tr. (Adrian Perez), ECF No. 21-4, Ex. R at CCC-77:11 to CCC-78:22; CCC-97:9 to CCC-101:1.

The state then called Victor Rivera, a police forensic investigator assigned to the case. Trial Tr. (Victor Rivera), ECF No. 41-7 at 1, CCC-147. Rivera testified that he found one bullet at the crime scene (but no cartridge), corroborating Perez's testimony that the weapon was a revolver. Trial Tr. (Victor Rivera), ECF No. 41-7 at 12:19-14:8, CCC-156:19-CCC-158:8. In addition, Amy Collins, a forensic scientist with the Illinois State Police, testified that she recovered a fingerprint impression matching Key's from a metal safe found in the apartment. Trial Tr. (Amy Collins), ECF No. 41-7 at 40:18-50:18, CCC-184:18-CCC-194:18. Next, the state called a handwriting expert who opined that Key handwrote the Statement of Facts. Trial Tr. (Ellen Schuztner), ECF No. 41-8 at DDD-102:14 to DDD-105:21. Just before resting the state's case, the chief prosecutor read the Statement of Facts to the jury and introduced it into evidence. *Id*. at 113:9-115:7. Key did not introduce any evidence. Trial Tr. (Anderson Ward), ECF No. 41-9 at 8:20-9:5, EEE-7:20 to EEE-8:6.

The jury convicted Key of the first-degree murder of Williams, the attempted first-degree murder of Perez, and the armed robbery of both victims. The state trial court sentenced Key to serve the remainder of his natural life in prison. *See* ECF No. 21, Ex. A at 1–2.

**E.  Proceedings After Trial And Sentencing**

*1.  Direct Appeal and Petition for Leave to Appeal*

The Office of the State Appellate Defender represented Key on direct appeal. Reply Brief and Argument for Pet'r-Appellant, ECF No. 21-3, Ex. N at 8. Key raised a single issue on

direct appeal (that is unrelated to the present habeas corpus petition) regarding the trial court's alleged failure to properly admonish him under Illinois Supreme Court rules as to the proper method for preserving claims for appeal following the imposition of sentence. Reply Brief and Argument for Def.-Appellant, ECF No. 21-3, Ex. H at 1. The state appellate court affirmed. ECF No. 21-2, Ex. A at 4. Key renewed the same issue in his petition for leave to appeal ("PLA") before the Supreme Court of Illinois. *People v. Key*, No. 100794 (ECF No. 21-4, Ex. I). The PLA was denied. *People v. Key*, No. 100794 (ECF No. 21-4, Ex. J).

> 2. *State Post-Conviction Proceedings*

Key then filed a *pro se* post-conviction petition in the state court arguing that the trial court erred in denying the motion to suppress, that the trial court violated his Fifth Amendment right not to be compelled to be a witness against himself by making him speak during the suppression hearing, and that his appellate counsel was ineffective on direct appeal for failing to raise these two issues. ECF No. 21-4, Ex K at C-28 to C-34. The state trial court denied the motion. ECF No. 21-2, Ex. B at 14.

Once again represented by a public defender, Key appealed. ECF No. 21-4, Ex. L. He argued that the state trial court erred when it summarily dismissed his *pro se* post-conviction petition because the petition stated the gist of a claim of ineffective assistance of counsel, that the Statement of Facts should have been suppressed because it was protected by attorney-client privilege or the work product doctrine, that his trial counsel was ineffective for instructing him to prepare an incriminating piece of evidence without warning him of the dangers of possible disclosure, and that his trial counsel's representation following the emergence of the Statement issue created a conflict of interest. *Id.* at 8–28.

The state appellate court affirmed. ECF No. 21, Ex. B (Ill. App. Ct. 1st Dist. 2008). The appellate court's ruling focused primarily on Key's ineffective assistance of appellate counsel argument. The court applied the controlling *Strickland v. Washington*, 466 U.S. 668 (1984), standard. *Id*. at 11-12. The state appellate court concluded that a challenge to the suppression ruling on direct appeal would have been "without merit" and additionally that there was "substantial" evidence to support the petitioner's conviction such that he could not establish the *Strickland* prejudice prong. *Id*. at 18. This evidence included Perez's (the surviving shooting victim's) identifications of Key from a photo array, at a lineup, and at trial. *Id*. The court also noted that there was forensic evidence (petitioner's thumbprint on the safe) placing him at the scene of the crime. *Id*.

Key filed a *pro se* PLA in the Illinois Supreme Court. *Illinois v. Key*, No. 107088 (Ill.), ECF No. 21-4, Ex. P. The PLA argued that the appellate court erred in finding that there was substantial evidence to support the conviction and thus no prejudice under the *Strickland* standard. *Id*. at 1. Key also contended that Perez's testimony identifying petitioner as the shooter was questionable in light of the severity of Perez's injuries. *Id*. at 2-3. And Key contended that the state appellate court's prejudice finding did not concern *Strickland* at all but rather went to the question of whether he could be sentenced to life in prison. *Id*. at 2. For Key to have qualified for a life sentence, Illinois law required a finding that he personally discharged the firearm resulting in great bodily harm or the death of the victim. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (Supp. 1999). The Supreme Court of Illinois denied the PLA. *Illinois v. Key*, No. 107088, ECF No. 21-4, Ex. Q.

*3. Federal Habeas Petition*

11

On January 29, 2010, Key filed in this court a *pro se* 28 U.S.C. § 2254 habeas corpus petition raising several claims. ECF No. 1. After respondent filed a response on June 19, 2013, the court appointed counsel to represent Key and granted him leave to file an amended petition. ECF No. 34. Following another round of briefing, the court, in an exercise of its discretion, found that the interest of justice warranted re-briefing after new counsel was appointed to represent Key. ECF Nos. 55, 56. Key filed his second amended habeas petition on August 26, 2015. ECF No. 68. He raises seven issues.

(A) Regarding the Statement, he contends that:

(1) the trial court "abused its discretion" by finding that the Statement was not a legal communication to Ward and was instead written for another purpose, because clear and convincing evidence showed that the Statement was not a gang kite, was written at the direction of Ward, and that Key intended to deliver it to Ward (2d Am. Pet., ECF No. 68 at 8);

(2) the seizure of the Statement and its admission at trial violated Key's Sixth Amendment right to receive the assistance of counsel because the Statement was a privileged communication (*Id.* at 13);

(3) the seizure of the Statement and its admission at trial violated Key's First Amendment right of access to the courts (*Id.* at 18); and

(4) the above violations prejudiced Key's right to a fair trial.

(B) Key alleges that he received ineffective assistance of counsel in three ways:

(1) trial counsel instructed him to prepare the Statement without advising him of the possible consequences (*Id.* at 22);

12

(2) trial counsel failed timely to secure the envelope Key claimed contained the
Statement because it was a key piece of evidence and securing it promptly
with a demonstrable chain of custody would have countered the state's
argument that Key could have fabricated the envelope introduced at the
suppression hearing (*Id*. at 24); and

(3) appellate counsel should have appealed the trial court's denial of the motion
to suppress and should have raised an ineffective assistance of trial counsel
claim on direct appeal because both arguments were clearly stronger than the
arguments appellate counsel raised, and Key repeatedly asked the appellate
counsel to appeal those issues (*Id*. at 26).

After the parties filed briefs on the second amended petition, the court ordered
supplemental briefing on the issue of whether Key's procedural defaults were excusable under
two recent Supreme Court cases, *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569
U.S. 413 (2013). ECF No. 78. All matters are now fully briefed and ready for ruling.

## II. DISCUSSION

The state contends that most of Key's claims, all except subparts (B)(1) and (B)(3) above,
are time-barred because Key's second amended petition was filed outside the one-year
limitations period of 28 U.S.C. § 2244(d)(1), and most of the new allegations in the second
amended petition do not relate back to the filing date of Key's initial federal habeas petition. *See*
ECF No. 72 at 14. Next, the state contends that Key's claims are procedurally defaulted because
he did not raise claims (A)(1)–(3) in his direct appeal, claim (A)(4) in any proceeding, and
claims (B)(1)–(2) in his state postconviction petition. *Id.* at 20–22. Alternatively, the state argues

13

that Key's claims fail on their merits.  The court determines that it is unnecessary to reach most of the procedural issues for the reasons discussed below.

### A. **Preliminary Matters**

#### 1. *Statute of Limitations*

A one-year statute of limitations applies to § 2254 petitions. *See* 28 U.S.C. § 2244(d)(1). The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending is not counted toward the period of limitation. *Id.* § 2244(d)(2). A court may excuse compliance with the one-year limitations period based on the doctrine of equitable tolling. *Holland v. Florida*, 560 U.S. 631, 645 (2010) (collecting cases). Additionally, under Federal Rule of Civil Procedure 15(c)(1)(B), an amended pleading relates back to the date of the original pleading when the amendment "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."

The state contends that Key's substantive claims (A)(1)–(A)(4) and (B)(2) were time barred because the second amended petition was filed outside the one year limitations period and those claims do not relate back to the claims in the original petition.  *See* ECF No. 72, at 14. The state concedes that the original petition was timely filed.  *See id.*  Key contends that the claims in the second amended petition are "clearly 'tied to a common core of operative facts' as the claims raised—or attempted to be raised—in his initial habeas petition." *See* ECF No. 74 at 14 (*citing Mayle v. Felix*, 545 U.S. 664, 664 (2005)). In his original *pro se* petition under "Ground one" Key wrote that his "Trial [counsel] was ineffective and should have recused himself after defendants motion to suppress [the] statement illegally seized was denied . . . . Trial [counsel] was ineffective because he instructed defendant to prepare an . . . extremely incriminating piece

14

of evidence without warning him of the dangers." ECF No. 1 at 5. Under "Ground two," Key alleged that his appellate counsel was ineffective "because she failed to raise various issues in direct appeal, such as challenging the trial [court's] ruling on the motion to suppress which said order . . . violates petitioner's constitutional rights under the 5th, 6th, and 14th amendments . . . ." *Id.* Ground two also alleged that Petitioner's appellate counsel was ineffective "because she failed to raise ineffective assistance of trial [counsel]." *Id.* at 6.

The court bypasses the limitations and relation back analyses in favor of reaching the merits of certain claims. This approach accords with the nature of the defense. The statute of limitations and procedural default defenses are not jurisdictional. *Johnson v. Lee*, 136 S. Ct. 1802, 1806 (2016) (procedural default); *Day v. McDonough*, 547 U.S. 198, 205 (2006) (statute of limitations). Courts have occasionally skipped over statute of limitations issues in favor of preserving judicial economy. *See Ramos-Martinez v. United States*, 638 F.3d 315, 324 (1st Cir. 2011) (noting the "pragmatic approach" of bypassing a complicated limitations issue "can be utilitarian in some cases" and that "a court occasionally may avoid addressing an enigmatic threshold issue by cutting directly to the merits"); *Pough v. United States*, 442 F.3d 959, 965 (6th Cir. 2006) (explaining that issue of timeliness of § 2255 motion may be bypassed and claims decided against petitioner on the merits). The Seventh Circuit previously chose to "skip over the tangled statutes of limitations issues" to "come directly" to the merits of the claims in the context of a fraud claim. *Carr* v. CIGNA Sec., Inc., 95 F.3d 544, 547 (2011).

Indeed, on a related issue, the Seventh Circuit has previously decided a § 2254 petition before reaching the state's procedural default defense when the petitioner's claim failed on the merits. *Johnson v. Pollard*, 559 F.3d 746, 752 (7th Cir. 2009); *see* 28 U.S.C. § 2254(b)(2); *see, e.g.*, *Bell v. Cone*, 543 U.S. 447, 451, 451 n.3 (2005) ("an application for habeas corpus may be

denied on the merits, notwithstanding a petitioner's failure to exhaust in state court"); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (acknowledging that a federal court may deny a petition for habeas corpus on the merits without resolving whether the issue was presented fairly to the state courts). The courts of appeals for other circuits also seem to be in agreement. *See Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002); Federal Habeas Manual § 9B:5 (West).

Key's § 2254 petition turns in large part on a single factual ruling by the trial court that the Statement was not written at Ward's request. It is not necessary to address the state's statute of limitations defense, because, as discussed more fully below, Key has failed to establish by clear and convincing evidence that the trial court's factual determination that the Statement was not written to his attorney was unreasonable.

### 2. *Procedural Default*

With the exception of the analysis in Part II.E *infra*, the substance of the procedural default issues the state raises—specifically the cause and prejudice analysis—dovetail with the analysis in Part II.C of the state trial court's suppression rulings. The governing principles are set forth below, however, because they frame the analysis that follows.

A habeas petitioner must give the state courts one full opportunity to resolve any federal constitutional issues by invoking one complete round of the State's established appellate review process before seeking federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also* 28 U.S.C. § 2254(b)(1). A federal court may not grant relief on a procedurally defaulted claim unless a petitioner establishes cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrates that the court's failure to consider

16

the claim will result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991), *superseded by statute on other grounds*, 28 U.S.C. § 2254(b)(2).

The state contends that Key's claims (A)(1)–(4) and (B)(1)–(2) are procedurally defaulted because he did not raise claims (A)(1)–(3) in his direct appeal, claim (A)(4) in any proceeding, and claims (B)(1)–(2) in his state postconviction petition. ECF No. 73 at 20–22. It is undisputed that some of the claims Key asserted in the second amended petition were not raised during Key's merits appeal. *See* ECF No. 74 at 16. Key argues that his appellate counsel's "reckless indifference" to his request that she raise the ineffective assistance of trial counsel claim and appeal the trial court's decision on the motion to suppress amounted to ineffective assistance of appellate counsel. *Id*.

"Ineffective assistance of counsel [] is cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Hence, an allegation may be subject to federal habeas review if the "ineffective assistance claims are presented 'as a means to reach' the embedded claims and those claims are the real substance of a petitioner's challenge." *McGee v. Bartow*, 593 F.3d 556, 567 n.9 (7th Cir. 2010); *see also Malone v. Walls*, 538 F.3d 744, 755 (7th Cir. 2008) (reaching issue because the petitioner had raised "ineffective assistance of appellate counsel as a means for the court to reach the ineffective assistance of trial counsel, *i.e.*, as the cause for failing to raise the ineffective assistance of [trial] claim"). However, "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim" that must be presented adequately to the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (emphasis omitted).

17

A petitioner must also show that the cause for the procedural default resulted in prejudice. When the petitioner seeks to excuse his default on the ground of ineffective assistance of counsel, at a minimum he must satisfy the *Strickland* prejudice standard for showing ineffective assistance of counsel. *See, e.g.*, *O'Rourke v. Endell*, 153 F.3d 560, 570–71 (8th Cir. 1998); *Turner v. Johnson*, 106 F.3d 1178, 1188 (5th Cir. 1997).

As with ineffective assistance of trial counsel claims, courts apply the two–prong test set forth in *Strickland* to evaluate the effectiveness of appellate counsel. S*ee Suggs v. United States*, 513 F.3d 675, 678 (7th Cir. 2008). Under the *Strickland* performance prong, an appellate lawyer's performance is constitutionally deficient if counsel fails to appeal an issue that is obvious and "clearly stronger" than the claims counsel raised on appeal. *See id.*; *Sanders v. Cotton*, 398 F.3d 572, 585 (7th Cir. 2005). To establish the *Strickland* prejudice prong, Key must show that there is a reasonable probability that but for his appellate counsel's deficient performance, the result of the appeal would have been different. *See Suggs*, 513 F.3d at 678; *Lee v. Davis*, 328 F.3d 896, 901 (7th Cir. 2003).

Here, most of Key's claims are procedurally defaulted because he did not raise them on direct appeal when appellate counsel represented him. In order to excuse the procedural default, Key must show that appellate counsel was ineffective for failing to raise arguments despite Key's repeated requests that Mann (appellate counsel) preserve them. Key must also show that there was a reasonable probability that the appellate court would have granted relief if Mann had made the arguments Key claims should have made. In turn, Key must show that there was a reasonable probability that the appellate court would have found the trial court's factual findings regarding the Statement were clearly erroneous. This cause and prejudice determination

necessarily rests on Key's arguments concerning the merits of the state trial court's suppression rulings.

Similarly, there is no need to decide the state's contention that Key procedurally defaulted his ineffective assistance of trial counsel claim (B)(1) for failing to raise it in his state post-conviction petition because Key's claims fail on their merits as discussed in Part II.C. *See Johnson*, 559 F.3d at 752.

### B.  Scope of Federal Habeas Review and Standards of Review

The writ of habeas corpus is known as the Great Writ due to the vital role it plays in safeguarding constitutional rights. *Carbo v. United States*, 364 U.S. 611, 615 (1961). Nevertheless, its scope has been significantly limited by procedural rules that govern whether the court may reach the merits of a petitioner's claim. It is also statutorily limited as under 28 U.S.C. § 2254, a federal court considering a state habeas petition must decide whether the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A decision is based on an unreasonable determination of the facts "[i]f the petitioner can show that the state court determined the underlying factual issue against the clear and convincing weight of the evidence." *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003); *see also Harding v. Walls*, 300 F.3d 824, 828 (7th Cir. 2002). The petitioner must show that the state court's determination of the facts was unreasonable. *Rice v. Collins*, 546 U.S. 333, 338–39 (2006). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15

(2013). That reasonable minds reviewing the record might disagree about the factual finding does not suffice to supersede the trial court's factual finding. *Rice*, 546 U.S. at 334-35. Thus, where permissible alternatives exist, the factual finding must not be disturbed. *Id.*; *see also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (§ 2254(e)(1) standard is "demanding but not insatiable").

### C. The State Trial Court's Factual Findings Were Not Unreasonable Determinations of the Facts

Key argues that the trial court abused its discretion when it found that the Statement was not intended to be a privileged attorney-client communication but rather "was a writing maintained for Mr. Key's personal reference or general dissemination throughout the jail." Suppression Ruling at 6, ECF No. 21-4, Ex. M at 21. The court reads Key's second amended petition as contending that the trial court's finding was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" because this is the standard under which this court can review the state trial court's factual determinations on a habeas petition. 28 U.S.C. § 2254(d)(2).

Although, given Ward's sworn testimony, a court could reasonably have reached a different result, there was adequate evidence supporting the state trial court's findings that the Statement was not written for Ward or at Ward's direction. As detailed above, the trial testimony of Key and Howar conflicted on how the Statement was found, and kept, among Key's personal belongings in his cell. The trial judge ultimately credited Howar's testimony. *See* ECF No. 21-2, Ex. B at 14 (summarizing testimony); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("[28 U.S.C.] § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *United States v. Peterson-Knox*, 471 F.3d 816, 823 (7th Cir. 2006) ("we give special deference to [the

20

trial judge's] findings, as he had the best opportunity to observe the witnesses"); *Murrell v. Frank*, 332 F.3d 1102, 1112 (7th Cir. 2003) ("[W]e must presume that all factual determinations made by the state courts, including credibility determinations, are correct, unless rebutted by clear and convincing evidence." (emphasis omitted)).

The evidence that supported the trial court's decision can be summarized as follows:

- The Statement was not addressed to Ward; it was not labeled as a letter or message to counsel; and it did not contain any notations that would apprise someone that it was a confidential communication between a lawyer and client.

- It was written in coarse language inconsistent with a letter to a lawyer and inconsistent with Ward's unrebutted testimony that Key spoke respectfully to him when they interacted personally;

- The trial court credited Howar's testimony that the Statement was found loose among gang kites and not in an envelope addressed to Ward;

- The trial court did not believe Key's testimony that he folded the Statement lengthwise rather than in the "square" folds typical of a gang kite. Instead, the trial court credited Howar's testimony that the paper was folded in small squares.

- Key testified inconsistently during the suppression hearing about the appearance of the Statement when he last saw it. He first stated that the Statement was in the same condition as when he wrote it, other than "purplish marks" that looked like scratches. However, he later denied that the multiple folds that, if utilized, would result in a small square shape, were on the Statement when he last saw it.

- The state introduced into evidence a gang kite recovered from Key's cell that listed Key as a member of the Gangster Disciples. Coupled with Howar's testimony that the

Gangster Disciples ban homosexual behavior and the victims' identity as transsexual, the state trial court had a reasonable basis to find that Key had a motive separate from communicating with his lawyer for preparing the Statement. On the other hand, Key denied being a member of the Gangster Disciples and testified that he quit in 1997, before the events that led to Key's arrest.

The state trial court also had the following conflicting evidence before it:

- The Statement did not include the elements of a letter, which could be seen as consistent with Ward's testimony that he thought Key would deliver the Statement to Ward by hand.

- The Statement did not include the usual elements of a kite such as a date, a description of who wrote the kite, who the intended recipient was, and a salutation and closing.

- An envelope with Ward's name and "legal mail" was introduced into evidence and was wrinkled, as Key testified.

- Howar testified that on his initial reading of the Statement, he did not believe it was a gang kite. He subsequently changed this mind.

Based on this conflicting evidence, the trial court's determination that the Statement was not written to Ward cannot be found to have been unreasonable. The resolution of this issue necessarily depends on inferences drawn from the exhibits admitted at the suppression hearing as well as the credibility of Howar, Ward and Key. The trial court rejected Key's testimony and found Howar's testimony to be "candid, credible, and convincing." Suppression Hr'g Tr. (Finding of Court), ECF No. 21-2, at LL-5:15-18. The state trial court was free to disbelieve Key's proposed motive for drafting the Statement. In addition, Ward's request, to which he

testified, does not foreclose a finding that this particular statement was written for another purpose. The state's theory was that Key was an active member of the Gangster Disciples street gang that banned homosexual behavior and he needed to explain his contact with two transsexual women to his superiors in the gang. This theory gave one alternative motive for the Statement. Reasonable minds could disagree as to the inferences to be drawn from the foregoing testimony considered along with the exhibits admitted at the suppression hearing. *See Rice*, 546 U.S. at 334-35. That means this court must give the state trial court's factual determinations deference. *See* 28 U.S.C. § 2254(d)(2).

Key also points out that the state's only contrary argument at the suppression hearing was that the Statement was a gang kite, and the state's only witness, Howar, stated that the document did not "appear to be a normal kite type." Trial Tr. (Eduardo Howar), ECF No. 41-2 at KK-110:14–20. Key contends that the trial court's finding, given Howar's testimony, was not supported by any evidence. Yet it is not entirely inconsistent for the trial court to determine that Howar was a credible witness who stated that the Statement "does not appear to be a normal kite type" and "does not appear to be a communication from one gang member to another," and make a factual finding that the Statement was not written in response to Ward's request. *Id.* Even if the Statement was not a "normal kite type" or an ordinary gang "communication," the trial court could have reasonably concluded that the Statement was not written for Key's attorney based on its coarse language together with the other evidence that he had another motive to write the Statement. *Id.*

This conclusion is also supported by the rule that a party asserting attorney-client privilege has the burden of proof. *See In re Marriage of Decker*, 606 N.E.2d 1094, 1108 (Ill. 1992) (quoting *Krupp v. Chicago Transit Authority*, 132 N.E.2d 532, 536 (Ill. 1956)) "[O]ne

who claims to be exempt by reason of privilege from the general rule which compels all persons to disclose the truth has the burden of showing the facts which give rise to the privilege."). The trial court could have reasonably concluded that Key was unable to meet his burden because the Statement's rough language was inconsistent with how Key communicated with Ward, because the Statement's physical appearance was inconsistent with Key's testimony, because Key's testimony that he wrote the Statement in response to Ward's request was not credible, and because the one month that passed between the time the Statement was recovered and the time Key produced the envelope was long enough to allow the state trial court reasonably to doubt the envelope's legitimacy. The trial court's finding was not an "unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d)(2).

Key also argues that the state trial court's ruling is "incredible" because "the court itself acknowledged at the suppression hearing that the evidence clearly and unambiguously demonstrated that Mr. Key prepared the statement for his attorney" when it stated, "Well, we know it's a letter he wrote to J. Anderson Ward." ECF No. 68 at 13. However, read in context, the state trial court appeared to agree that he was referring to Key's position rather than making a finding of fact:

> [PROSECUTOR]: Judge, my position is that [petitioner] has placed himself on the witness stand to say that that's a privileged communication. If he is about to say that [the Statement was true or not] – it all goes to his credibility as to whether that is, in fact, a letter that he wrote to J. Anderson Ward.
>
> THE COURT: Well, we know it's a letter he wrote to J. Anderson Ward.
>
> [PROSECUTOR]: I don't know that at all. It's not addressed to him.
>
> THE COURT: That's what he says. He's admitting that it was a letter he wrote to J. Anderson Ward. Your position is that it's something that he wrote to somebody else.

[PROSECUTOR]: That's right.

*See* Suppression Hr'g Tr. (Michael Key), ECF No. 41-2 at KK-62:17-KK-63:6.

Finally, Key argues that the state court conceded that the Statement was an attorney-client communication when it "did not challenge or correct Ward's characterization" that the letter was "in an envelope labeled 'legal mail.'" 2d Am. Pet., ECF No. 68 at ¶ 26. Ward made the Statement at issue during the hearing on a motion to obtain a handwriting sample. This hearing occurred on September 21, 2001, almost a month after Howar seized the Statement. The state first told Ward about the Statement at that hearing. Ward objected, stating that "the State has been kind enough to represent" that one of the documents it wanted to analyze "was a document which Mr. Key had in an envelope labeled 'legal mail' in which he was generating a statement of facts from his perspective to me." Id. ¶ 25. In these circumstances, the state neither waived nor forfeited a factual argument by failing to challenge Ward's remark. At the pre-suppression-hearing stage, the circumstances surrounding the Statement's creation and seizure were not squarely at issue, and the evidence had not been developed or presented to the state trial court. Accordingly, the state trial court remained free at the suppression hearing to find that the Statement was not in an envelope, and Key has not shown that this finding was unreasonable.

### D. <u>The Trial Court's Admission of the Statement Did Not Violate Key's Constitutional Rights</u>

Key's failure to establish that the trial court made an unreasonable factual determination is fatal to his claims (A)(2)–(A)(4). In those claims, Key claimed that the admission of the Statement at trial was a violation of his Sixth Amendment right to counsel, his First Amendment right to free speech, and his right of access to the courts. *Id.* at 13–20.

In support of his Sixth Amendment right to counsel claim, Key relies on *Nordstrom v. Ryan*, 762 F.3d 903, 910-11 (9th Cir. 2014), a § 1983 action which held that "the Constitution

does not permit . . . reading outgoing attorney-client correspondence." In *Nordstrom*, prison officials contended that they were permitted to read the plaintiff's legal mail as long as they did so in his presence. *Id.* at 910. The Ninth Circuit rejected this view and joined other circuits holding the same. *See id.* (collecting cases). Here, the state contends that the Supreme Court has not ruled on the issue of whether admission of attorney-client privileged documents at trial violates the United States constitution. ECF No. 72 at 33; *see Lange v. Young*, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989) ("Even if a violation of the attorney-client privilege occurred, this violation alone would be insufficient grounds for relief. The attorney-client privilege is a creation of the common law, not the Constitution.")

In support of his First Amendment right to free speech, Key also relies on cases that hold that interference with an inmate's communications with his attorney violates the inmate's right to free speech and right of access to the courts. *See Procunier v. Martinez*, 416 U.S. 396, 419 (1974) ("[I]nmates must have a reasonable opportunity to seek and receive the assistance of attorneys."); *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000) ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."); *Al-Amin v. Smith*, 511 F.3d 1317, 1333-4 (11th Cir. 2008) (finding that prisoners' use of written correspondence to communicate with their counsel "may frequently be a more important free speech right than the use of their tongues"); *Jones v. Brown*, 461 F.3d 353, 358-59 (3d Cir. 2006).

It is unnecessary to determine whether admission of an attorney-client privileged document at trial against an inmate would "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The underlying premise of Key's contentions

is that the Statement is a privileged document. Yet, as discussed above, the trial court found that the Statement was *not* a privileged document, and its finding was not unreasonable. *See id.* § 2254(d)(2).

Without the protection of attorney client privilege, the Statement must be deemed admissible evidence which did not result in a decision that is contrary to or involved an unreasonable application of Federal law. *See id.* at § 2254(d). Thus, Key is not entitled to relief on these claims.

### E. <u>Ward's Instruction to Prepare the Statement Was Not Prejudicial Under *Strickland*</u>

Key next argues that Ward provided ineffective assistance of counsel because he instructed Key to prepare the Statement without advising him of the potential consequences. ECF No. 68 at 22. The well-known *Strickland* standard governs whether Ward's performance is constitutionally ineffective. *See Strickland v. Washington*, 466 U.S. 668, 687–91 (1984). Under the first prong of *Strickland*, Key must show that his counsel's representation fell below an objective standard of reasonableness. *See id.* at 687–88. The second *Strickland* prong requires Key to establish that there is a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different. *See id.* at 694. If Key fails to make a proper showing under one of the *Strickland* prongs, the court need not consider the other. *See id.* at 697 ("In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . .") *see also Amerson v. Farrey*, 492 F.3d 848, 851 (7th Cir. 2007).

Key argues that Ward was ineffective "because he instructed Key to prepare the Statement but failed to advise Key of the range of possible consequences of that action, including the risks involved and the steps that he should take to ensure that the Statement remained

confidential." ECF No. 68 at 22. However, Key's failure to establish the unreasonableness of the state trial court's finding that the Statement was not written for Ward proves fatal to Key's ineffective assistance of trial counsel claim. Even if Ward was ineffective for requesting a written account of the crime, Key was not prejudiced because according to the trial court's findings, he did not write the Statement in response to that request. Key contends that he would "not have drafted the Statement had his attorney not directed him to do so." ECF No. 68 at 24. However, this contention is contradicted by the trial court's finding that Key did not write the Statement for his attorney. Obviously, Ward's testimony that he asked Key to write a summary did not convince the trial court that the document Howar found was that summary. Because this finding was not unreasonable, there is no "reasonable probability" that the outcome would have been different if Ward had not made the request. *Strickland*, 466 U.S. at 694. Thus, Key is not entitled to relief on this claim.

### F. **Ward's Ineffectiveness with Respect to The Envelope is Defaulted**

Key also maintains that Ward was ineffective "because he unreasonably failed to timely secure and preserve the envelope the Statement was sealed in, despite the fact that he knew the Envelope was a crucial piece of evidence." ECF No. 68 at 24. The law on procedural default discussed above is applicable here. *See* supra Part II.B.

Here, the trial record and the state post-conviction record are completely devoid of any mention of trial counsel's ineffectiveness for failing timely to secure the envelope. In order to reach the substance of this claim, Key must establish cause for the default, namely "some objective factor external to the defense" which precluded his ability to pursue his claim in state court. *See Murray v. Carrier*, 477 U.S. 478, 492 (1986). He must do so at each level of the state

direct appeal and post-conviction proceedings. *See McGee*, supra, 593 F.3d at 567 n.9. He has not done so.

First, Key has not established that his lawyer on direct appeal was ineffective for failing to raise this issue on appeal and in his direct PLA to the Illinois Supreme Court, given that Illinois allows a criminal defendant to raise an ineffective assistance of counsel claim on direct appeal if it depends on facts in the record. *See Malone*, supra, 538 F.3d at 755; *People v. Foster*, 660 N.E.2d 951, 958 (Ill. 1995). In his second amended petition and his reply, Key contends that procedural default in the direct appeal resulted from his appellate lawyer's ineffective assistance. *See* ECF No. 74 at 16. Key makes conclusory allegations in his petition that "he specifically noted that [appellate lawyer] needed to assert the arguments he instructed her to make so that those issues would be 'preserved for the record.'" 2d Am. Pet., ECF No. 68 at 28. Such conclusory statements without more are insufficient to defeat procedural default. *See Oliver v. United States*, 961 F.2d 1339, 1342 (7th Cir. 1992) (noting that the petitioner did "nothing more than state conclusory allegations of attorney error" when affirming the district court's finding that the petitioner had failed to show cause for his procedural default); Federal Habeas Manual § 9B:68 ("The petitioner must do more than simply allege that counsel's failure to present claims was due to ineffectiveness.").

Second, Key has not established cause for his failure to raise this issue in his state post-conviction proceedings. *See Dellinger v. Bowen*, 301 F.3d 758, 766–67, 767 n.10 (7th Cir. 2002) (petitioner failed to establish cause for default of claim that appellate counsel was ineffective for not raising claim that trial counsel was ineffective; petitioner failed to raise ineffectiveness claim of either trial or appellate counsel in state habeas proceedings, and he had no constitutional right to counsel in the state habeas proceedings). Rather than argue that cause exists to excuse his

procedural default, Key contends that the claims his appellate lawyer "failed to raise on appeal were presented in the state court post-conviction proceedings." ECF No. 74 at 17. However, nowhere in his *pro se* state post-conviction petition does he raise a claim that Ward was ineffective for failing timely to secure the envelope. *See id.*; ECF 21-4 at C-28 to C-34. This court solicited supplemental briefing on whether Key's defaulted claims may be reached via the *Martinez-Trevino* gateway because Key represented himself when he filed his state habeas petition. *See Martinez v. Ryan*, 566 U.S. 1, 1 (2012); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013). At the time, the Seventh Circuit had not spoken on whether the *Martinez-Trevino* gateway was available to Illinois prisoners, but it had recently held that "the *Martinez-Trevino* doctrine can apply to claims for ineffective assistance of counsel arising from the Indiana state courts." *Brown v. Brown*, 847 F.3d 502, 502 (7th Cir. 2017). After the parties submitted their supplemental briefs, the Seventh Circuit held in *Crutchfield v. Dennison*, 910 F.3d 968, 971 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 1587 (2019), that "Illinois does not impose the kind of restrictive procedural rules on Strickland claims to warrant application of the *Martinez–Trevino* exception." The holding of *Crutchfield* forecloses in this court Key's arguments that his defaulted claims may be reached under the *Martinez-Trevino* doctrine.

Accordingly, Key has defaulted this claim, and he has not established cause for the default. This means that the court need not address prejudice. *See Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir. 2010). Thus, Key is not entitled to relief on his claim of ineffective assistance of trial counsel for failing to timely secure the envelope.[5]

### G. Appellate Counsel's Ineffectiveness Was Not Prejudicial

---

[5] Even if this issue were considered part of the argument Key preserved, it would still fail due to the trial court's factual findings.

As with ineffective assistance of trial counsel claims, courts apply the two-prong test set forth in *Strickland* to evaluate the effectiveness of appellate counsel. S*ee Suggs v. United States*, 513 F.3d 675, 678 (7th Cir. 2008). Under the *Strickland* performance prong, an appellate lawyer's performance is constitutionally deficient if counsel fails to appeal an issue that is obvious and clearly stronger than the claims counsel raised on appeal. *See id.*; *Sanders v. Cotton*, 398 F.3d 572, 585 (7th Cir. 2005). To establish the *Strickland* prejudice prong, Key must show that there is a reasonable probability that but for his appellate counsel's deficient performance, the result of the appeal would have been different. *See Suggs*, 513 F.3d at 678; *Lee v. Davis*, 328 F.3d 896, 901 (7th Cir. 2003).

To establish that appellate counsel was ineffective for failing to appeal the trial court's denial of motion to suppress, Key must show that had Mann done so, there is a reasonable probability that the outcome of the appeal would have been different. *See Strickland*, 466 U.S. at 687–91. If Mann had properly appealed the trial court's denial of motion to suppress, the Illinois appellate court would "give great deference to the trial court's factual findings, and [it would] reverse those findings only if they are against the manifest weight of the evidence." *People v. Luedemann*, 857 N.E.2d 187, 195 (Ill. 2006) (citing *People v. Sorenson*, 196 Ill.2d 425, 431, 256 Ill.Dec. 836, 752 N.E.2d 1078 (2001)).

The Illinois appellate court considered the ineffective assistance of appellate counsel claims Key presented to it during his post-conviction appeal. ECF No. 41-15 at 12–13. The appellate court determined that the evidence against Key at trial was sufficient to convict even without the Statement. *Id.* at 13. The appellate court summarily concluded that Key's arguments regarding the Statement's status as a privileged attorney-client communication were "considered by the court and properly rejected." *Id.*

31

As discussed above in relation to Key's claims on the merits, this court determined that the trial court's finding that the Statement was not written to Ward was not an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). It is unclear whether the deference afforded under AEDPA for a trial court's factual findings differs from the standard of review applied by the Illinois Appellate Court. Yet Key's claim fails under the "manifest weight of the evidence" standard as well. *See Luedemann*, 857 N.E.2d at 195. The trial court considered the credibility of Key, the physical appearance of the Statement, the place where the Statement was found, Key's possible alternative motive in drafting the Statement, and the coarse language of the Statement. The trial court's finding was not against the "manifest weight of the evidence." The appellate court would have affirmed the trial court's decision under this standard. Consequently, appellate counsel's failure to raise trial counsel's ineffectiveness on direct appeal was not prejudicial because there is no "reasonable probability" that the outcome of the appeal would have been different. *See Strickland*, 466 U.S. at 687–91.

Similarly, the outcome of the appeal would not have changed even if Mann had challenged Ward's ineffectiveness on direct appeal because of the state courts' factual findings. *Johnson v. Thurmer*, 624 F.3d 786, 793 (7th Cir. 2010) (*citing Robertson v. Hanks*, 140 F.3d 707, 712 (7th Cir.1998)) ("Because Johnson's appellate counsel claim is predicated on trial counsel's errors, the two claims rise and fall together."). Under both *Strickland* prongs, then, Key is not entitled to relief on this claim.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, which provides that the district court must issue or deny a certificate of appealability when it enters "a final order adverse to the applicant," the court turns to whether a certificate of appealability should issue. Under 28

U.S.C. § 2253(c)(2), "(1) [a] certificate of appealability may be issued only if the prisoner has at least one substantial constitutional question for appeal; (2)[t]he certificate must identify each substantial constitutional question; (3)[i]f there is a substantial constitutional issue, and an antecedent non-constitutional issue independently is substantial, then the certificate may include that issue as well; (4)[a]ny substantial non-constitutional issue must be identified specifically in the certificate; [and] (5)[i]f success on a non-constitutional issue is essential (compliance with the statute of limitations is a good example), and there is no substantial argument that the district judge erred in resolving the non-constitutional question, then no certificate of appealability should issue even if the constitutional question standing alone would have justified an appeal." *Davis v. Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003).

For the reasons stated in this order, the court finds that Key has not made a substantial showing of the denial of a constitutional right as he has not demonstrated "that reasonable jurists could debate whether the challenges in his habeas petition should have been resolved differently or that his petition adequately shows a sufficient chance of the denial of a constitutional rights that he deserves encouragement to proceed further." *Rutledge v. United States*, 230 F.3d 1041, 1047 (7th Cir. 2000). Accordingly, the court declines to issue a certificate of appealability. Even though the court is denying Key a certificate of appealability, he may still appeal that denial or petition the Seventh Circuit, with or without a lawyer, to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22. A notice of appeal must generally be filed within 30 days. Fed. R. App. P. 4(a)(1)(A).

## IV. CONCLUSION

For the above reasons, Michael Key's request for a writ of habeas corpus under 28 U.S.C. § 2254 is denied. The court declines to certify any issues for appeal under 28 U.S.C. § 2253(c).

The clerk is directed to substitute Randy Pfister, warden of the Stateville Correctional Center, as the respondent and enter a Rule 58 judgment terminating this case. Finally, the court recognizes that appointed counsel (Robert L. Graham and Jonathan A. Beitner of Jenner and Block LLP) have dedicated a very significant amount of time to representing Key in this case. The court thanks counsel for their thorough and diligent work and commends them for their excellent service, both to their client and to the court.

Date: 2/13/2020

_____/s/_____
Joan B. Gottschall
United States District Judge